# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

United States of America,

      Plaintiff

v.

James Bates,

      Defendant

Case No.: 2:21-cr-00147-JAD-DJA

**Order Granting Motion for a New Trial**

[ECF Nos. 92, 141]

A drive-by shooting in downtown Las Vegas on a hot August morning triggered a manhunt for the shooter.  An eyewitness caught the license plate of the car, which belonged to Jesus Guerrero.  Police eventually found Guerrero—high on heroin and holed up for hours inside that car in the parking lot of his apartment complex.  Though he was law enforcement's primary suspect, Guerrero managed to shift their focus from himself to his roommate, James Bates.

Bates was charged with being a felon in possession of a firearm for that shooting.  He was also charged with a second felon-in-possession count, possession of methamphetamine with the intent to distribute it, and possession of a firearm in furtherance of a drug-trafficking crime because the backpack he was carrying on the day of his eventual arrest contained drug paraphernalia and the gun used in the drive-by shooting, and he had packages of meth in his pockets.  After a four-day trial, the jury found Bates guilty on all four counts.

Errant comments by the prosecutor during closing argument revealed that Bates had been located and arrested based on real-time GPS cell-phone tracking—evidence that was never disclosed to the defense.  Bates's two motions for new trial have further exposed that the government also failed to turn over 82 hours of body-worn-camera footage that includes Guerrero's arrest and officers' conversations and interactions with him, search warrants, and

Jencks Act material.  Because I find that the government suppressed material, exculpatory evidence in violation of its obligations under *Brady v. Maryland* and the interest of justice so requires, I grant Bates a new trial.

**Background**

**I.     The underlying facts[1]**

On August 18, 2020, a man fired a gun from a car window outside of the El Cortez Hotel and Casino in downtown Las Vegas, Nevada, aiming at a man he'd been arguing with moments earlier.  The car sped away, but a paramedic witnessed the shooting and jotted down the car's license plate.  The Las Vegas Metropolitan Police Department (Metro) traced that car to an apartment complex and eventually arrested its driver, Jesus Guerrero.

In hours of conversation with officers, Guerrero somehow redirected law enforcement's attention to his roommate, defendant James Bates.  Three days later, officers located Bates entering a Family Dollar store, carrying a black backpack.  They observed him exit the store, put the backpack in the car he'd arrived in, and return to the store, where he was arrested.  Officers searched Bates and found multiple bags of meth in his pockets.  They then searched the car he had arrived in and found a loaded 9mm Hi-Point firearm in the front pocket of the black backpack, ammunition, baggies (some empty, some containing meth), and clothing matching the August 18th shooter's.  And in a pair of black shorts found in the car, officers discovered bullet cartridges and more ammunition for the 9mm weapon.

The July 28, 2021, superseding indictment charged Bates with four counts: two counts of being a felon in possession of a firearm—one for being armed during the shooting on August 18th and the other for having the gun in his backpack on August 21st—and the others were drug

---

[1] These facts are derived from the evidence at trial.

2

charges: one for possession of methamphetamine with the intent to distribute it and the other for possessing a firearm while engaging in drug trafficking.[2]  Bates invoked his speedy-trial right, and trial began on August 17, 2021.[3]

## II.   The trial

### A.   The prosecution's case

#### 1.   Evidence related to the August 18, 2020, shooting

At Bates's jury trial, the prosecution put on five witnesses.  The first—a paramedic—saw the shooting on August 18th.[4]  She initially described the shooter as a man with dark, curly hair and testified that she was able to write down the license plate of the shooter's car and give it to the officers who arrived shortly after the shooting.[5]

Metro detective Bryan Moore was the second witness for the prosecution.  He testified about the investigation after the shooting and evidence recovered from the scene, namely a cartridge expended from the gun and poor-quality surveillance footage capturing images of the shooter.[6]  Moore said that, based on the surveillance footage, "the shooter was wearing a black hat; a long-sleeved black shirt; large, baggy black shorts; and then lightish—or, I should say, teal

---

[2] ECF No. 36.  Bates's initial indictment charged him with just one felon-in-possession count for the day of the arrest.  *See* ECF No. 1.

[3] ECF No. 61.

[4] ECF No. 85 at 176 (trial transcript).

[5] *Id.* at 186–87.

[6] ECF No. 87 at 15–16.  I cite to the CM/ECF pagination, not the original transcript pagination, throughout this order.

3

or gray shoes and was armed with a black hand—semiautomatic handgun."[7]  Moore further

described the shooter as a "lighter skinned Hispanic or white male with long dark hair."[8]

Moore also testified that officers ran a record check on the license-plate number that the

paramedic provided and learned that the car "was associated with a certain individual"—later

revealed to be Jesus Guerrero—at an apartment on East Flamingo Boulevard in Las Vegas.[9]

Moore explained that several officers went to that location, found that car, and "placed [it] under

surveillance until it became occupied and which point it drove from one portion of the parking

lot to another part."[10]  Moore said that, "at that point, the driver and sole occupant of the vehicle

was contacted by officers."[11]  Moore then obtained a search warrant for Guerrero's apartment,

where he found a prescription-pill bottle for James Bates, indicating that Bates also lived there.[12]

Moore next testified to viewing surveillance footage of the apartment complex's lobby.

In that video, a man wearing clothing matching the shooter's description enters the lobby shortly

after the shooting.[13]  Moore testified that no one wearing those clothes left the apartment again,

but he identified who he described as someone else in different clothes—Guerrero—leaving the

apartment minutes later.[14]  On cross-examination, defense counsel elicited testimony that Moore

wrote in his police report that "Guerrero's description was similar to the suspect described by the

victims and witnesses, and then in a second report . . . wrote that, due to the fact [that] Guerrero's

---

[7] *Id.* at 29.

[8] *Id.*

[9] *Id.* at 37.

[10] *Id.*

[11] *Id.*

[12] *Id.* at 42.

[13] *Id.* at 52.

[14] *Id.* at 53.

physical description was similar to the shooter, officers responded to" his apartment complex.[15] Defense counsel also cross-examined Moore regarding the contents of an interview with Guerrero in which Guerrero "uttered . . . some untruths" and "offered up Mr. Bates," making Bates "the focal point of [his] investigation."[16]

FBI agent Daniel Harris was then put on to recount his analysis of Bates's cell-phone location on the day of the shooting.  He testified that, based on data retrieved from the phone, he was able to determine that Bates's phone was in range of a cell tower covering the location of the shooting when the shooting occurred.  On cross-examination, defense counsel introduced evidence that the shooting occurred close to a Samaritan House (a halfway house and rehabilitation center) that Bates listed as his phone's billing address.[17]  Counsel also established that Harris only reviewed the cell-phone data for the two hours surrounding the shooting, despite having thirty days of data that may have shown Bates's regular presence in the tower range that covered both the halfway house and the shooting location—suggesting that Bates was at the halfway house on the day of the shooting.[18]

### 2.   Evidence related to Bates's arrest on August 21, 2020

The government called Metro detective John Alessio to testify about Bates's arrest three days after the shooting.  Alessio testified that he "became aware" of Bates's location on that day and was dispatched to arrest him.[19]  Bates was tracked via helicopter to a Family Dollar store,

---

[15] *Id*. at 67.

[16] *Id*. at 72.

[17] *Id*. at 141–42.

[18] *Id*. at 143–45.

[19] *Id*. at 170.

where he was arrested by several plain-clothed officers.[20]  Alessio testified that he saw Bates

entering the store with a black backpack on.[21]  He helped arrest Bates and searched him for

weapons.[22]  He didn't find any, but he did find small bags of meth in Bates's pockets.[23]

Metro detective Moore then returned to the stand to testify about the search of the car that

Bates was traveling in the day of his arrest.  He recounted that officers found a 9 mm Hi-Point

firearm, meth, and several small empty baggies in the backpack Bates was seen carrying

earlier.[24]  They also found a pair of baggy black shorts with ammunition cartridges in the pockets

and other clothing matching what the shooter wore on August 18th.[25]

The government's last witness, a forensic scientist and expert in DNA analysis, testified

that she tested a swab taken from the gun found in Bates's backpack.[26]  But the swab contained

at least five DNA profiles and she could not determine whether any belonged to Bates.[27]  The

parties also stipulated that a ballistics test confirmed that a bullet and spent cartridges recovered

from the scene of the drive-by shooting "had been cycled through the Hi-Point pistol" found in

Bates's backpack.[28]

---

[20] *Id.* at 171.

[21] *Id.* at 173–74.

[22] *Id.* at 177.

[23] *Id.* at 178.

[24] *Id.* at 211.

[25] *Id.*

[26] ECF No. 88 at 53.

[27] *Id.* at 57–58.

[28] These stipulations were read to the jury at the close of the government's case-in-chief on day three of the trial.

1  **B.    Bates's defense case**

2         The defense's case-in-chief consisted of one witness: the paramedic-eyewitness who'd

3  kicked off the government's case.  She testified that she'd become concerned following her

4  initial testimony because she "looked at" Bates in the courtroom that day, realized that she had

5  "never seen that man before," and was convinced that he wasn't "the guy [she] saw point the gun

6  at the other guy" on August 18th.[29]  She specified that the man she saw was Hispanic with curly

7  hair, and Bates did not meet either identifier.[30]

8  **C.    Closing arguments**

9         Throughout the trial, Bates's defense theory was that Guerrero was the August 18th

10  shooter, falsely shifted the blame to Bates, told the police where Bates would be on August 21st,

11  and planted the smoking gun in his backpack.[31]  In the government's case-in-chief, no witness

12  explained how law enforcement found Bates on the 21st—arresting detective John Alessio

13  merely testified that "at some point" he "bec[a]me aware" of Bates's location.[32]  So, based on

14  that testimony, the defense prepared a closing argument advancing the Guerrero-framed-me

15  theory.

16         But in the government's closing argument, the prosecutor mistakenly recounted that

17  Alessio had testified that "he had active real-time data for the defendant's phone, and they used

18  that to locate him," poking a significant hole in the defense's proffered version of events.[33]

19  Defense counsel requested a sidebar, objecting to the prosecution's inaccurate statement of the

20

---

21  [29] *Id.* at 96.

    [30] *Id.* at 97.

22  [31] ECF No. 61 at 2.

    [32] ECF No. 87 at 170.

23  [33] ECF No. 89 at 47.

7

evidence, which I overruled because the jury was instructed to rely on their own recollection of the testimony and that closing arguments are not evidence.[34]  In the defense's closing argument, counsel advanced his theory and told the jury that no witness testified to real-time tracking.[35]  On rebuttal, the prosecutor thrice referred to the defense's case theory as a "fantasy" unsupported by the evidence.[36]

The jury found Bates guilty on all four counts.[37]

### III.   Bates's first new-trial motion

On November 18, 2021, Bates filed a motion for a new trial under Federal Rule of Criminal Procedure 33.[38]  In it, he argues that defense counsel was never given any evidence that he was being tracked in real time on August 21st, despite having requested information on how he was located.[39]  The only phone-related information that the prosecution disclosed was the use of historical cell data to review Bates's movements from July 18, 2020, through August 18, 2020.[40]  But throughout the briefing on the first new-trial motion, the government disclosed the search warrants and pen register that allowed Detective Alessio to track Bates's phone in real time on the 21st.[41]  Bates argues that the failure to disclose that information when the defense requested it amounts to prosecutorial misconduct warranting a new trial.  Bates also argues that the prosecutor's characterization of the defense's theory as "fantasy" impermissibly denigrated

---

[34] *Id.* at 60.

[35] *Id.* at 66.

[36] *Id.* at 82, 86.

[37] ECF No. 70.

[38] ECF No. 92.

[39] *Id*. at 3.

[40] *Id.*

[41] *See* ECF No. 137-5.

the defense and undermined counsel's credibility before the jury.  The court heard oral argument on this first motion on December 6, 2022.[42]

In the middle of briefing on Bates's first new-trial motion, Bates's trial counsel moved to withdraw.[43]  I granted that motion and appointed Osvaldo E. Fumo, Esq. as his new attorney.[44] But Bates moved to replace Mr. Fumo five months later, and I appointed Maysoun Fletcher, Esq. instead.[45]

## IV.   Bates's second new-trial motion

On December 15, 2022, Bates (through his new counsel Ms. Fletcher) filed a second motion for a new trial, this time based on newly discovered evidence.[46]  Bates identifies three categories of evidence that he alleges the government withheld.  First, he supplements his prior motion about real-time tracking, arguing that the government failed to disclose evidence of the search warrants and pen register authorizing the trace and that this newly discovered evidence would have changed the way his trial counsel approached their strategy.[47]  Second, Bates argues that the prosecution failed to disclose potentially exculpatory surveillance footage from the Family Dollar parking lot where he was arrested, speculating that it may have shown Metro officers manipulating evidence.[48]  And third, Bates contends that the prosecution failed to disclose exculpatory body-worn-camera footage related to the initial questioning and arrest of

---

[42] ECF No. 139.

[43] ECF No. 105 (filed under seal).

[44] ECF No. 113; ECF No. 114.

[45] ECF No. 125; ECF No. 126.

[46] ECF No. 141.

[47] *Id.* at 6, 10–12.

[48] *Id.* at 4, 8–9.

alternative-suspect Guerrero, which he argues would show Guerrero, "the initial suspect, under the influence of heroin, hiding in the car used in the shooting just a few hours prior, acting shifty, providing false information to the police, providing information only the actual shooter would have known, and further would capture the three cartridges found in plain view on his front seat."[49]

The day before the scheduled hearing on this second motion, the government disclosed for the first time several hours of bodycam footage related to police officers' interactions with Guerrero on August 18, 2020.[50]  Andrew Duncan, Esq. and Stephanie Ihler, Esq., the assistant United States attorneys who prosecuted Bates's case, attended the hearing and shared their recollections of pretrial conversations they had with defense counsel about the footage.[51] Federal public defenders Jawara Griffin, Esq. and Heidi Ojeda, Esq., Bates's trial counsel, also attended to recount their version of events.[52]  The government argued that defense counsel was made aware of the existence of the footage before trial but declined the offer to receive it.[53] Bates's trial attorneys insisted that they were not told of the footage and, in fact, had specifically asked for bodycam videos from August 18th but were told that none existed.[54]  Through new counsel on both sides, the parties also disputed whether the footage is exculpatory and provided very different interpretations of what the videos show to support their arguments.[55]

---

[49] *Id.* at 10.

[50] *See* ECF No. 146 (notice of manual filing).

[51] *Id.*

[52] *Id.*

[53] ECF No. 152 (motion hearing).

[54] *Id.*

[55] *Id.*

**Discussion**

In the foundational case of *Brady v. Maryland* and its progeny, the Supreme Court of the United States has cemented the principle that, to comport with a criminal defendant's constitutional due-process rights, the government has an "affirmative duty to disclose evidence favorable to a defendant."[56]  A defendant must prove three elements to show a *Brady* violation warranting a new trial: (1) "the suppressed evidence must be favorable to the accused," i.e., it must be exculpatory; (2) "the evidence must have been suppressed by the government, either willfully or inadvertently"; and (3) "the suppressed evidence must be material to the guilt or innocence of the defendant."[57]

Bates contends that two categories of newly discovered evidence qualify as material *Brady* evidence that the government failed to turn over: (1) bodycam footage from the investigation of the shooting centered around Guerrero's arrest, and (2) potential surveillance footage from the Family Dollar store showing the search of Bates's car after his arrest.[58] Because it is dispositive, I focus on the bodycam footage of police interactions with Guerrero after the shooting.

---

[56] *Kyles v. Whitley*, 514 U.S. 419, 432 (1995) (citing *Brady v. Maryland*, 373 U.S. 83 (1963)).

[57] *U.S. v. Jernigan*, 492 F.3d 1050, 1053 (9th Cir. 2007) (en banc).

[58] With respect to the Family Dollar footage, Bates has not shown that any such video exists, that the government is in possession of it, that it would have constituted exculpatory or impeachment evidence, or that Metro or the prosecution were derelict in their investigative duties by failing to request and preserve such evidence.  *See United States v. Lucas*, 841 F.3d 796, 809 (9th Cir. 2016) (noting that, "to challenge the government's representation that it does not have *Brady* evidence, [the defendant] must do more than speculate that *Brady* material exists")*.*  Indeed, the surveillance videos Metro did collect from the Family Dollar were for use in a routine internal-affairs investigation of the force used to arrest Bates and thus only captured the inside of the store, where the arrest took place.  Bates has provided no authority to support the argument that Metro was required to obtain additional surveillance as part of its investigation pertaining to him.

1

2
**I.      The bodycam footage of Metro's investigation and Guerrero's arrest and detention
is exculpatory evidence.**

3       The parties dispute whether the bodycam footage is sufficiently favorable to the defense

4   to qualify as *Brady* material.  Evidence is favorable if it would "tend to exculpate [the defendant]

5   or reduce the penalty."[59]  Evidence demonstrating that there may be an alternative suspect can be

6   exculpatory under *Brady*.[60]

7       *A.      Summary of the bodycam footage*

8       The bodycam footage shows a fairly comprehensive manhunt for Jesus Guerrero in the

9   hours following the August 18th shooting.  Officers ran the license plate of the car described at

10  the scene, identified Jesus Guerrero as its primary driver, and located his home address.  One of

11  the videos reflects that officers received photos of Guerrero as they were driving to his apartment

12  complex and were clearly looking for him.[61]  Chatter on the police radio described him as a

13  match for the shooting suspect and provided a description of what the shooter was wearing to

14  assist the officers in locating Guerrero.[62]

15

16

17

18   [59] *Brady*, 373 U.S. at 88.

19   [60] *See Carrillo v. City of Los Angeles*, 798 F.3d 1210, 1225 (9th Cir. 2015) (noting that, in the
context of a § 1983 qualified-immunity analysis, it is clearly established that alternative-suspect
evidence falls within *Brady*'s scope); *see also Williams v. Ryan*, 623 F.3d 1258, 1265 (9th Cir.

20  2010) (noting that "new evidence suggesting an alternate perpetrator is 'classic *Brady* material'")
(quoting *Boyette v. Lefevre*, 246 F.3d 76, 91 (2d. Cir. 2001)).

21   [61] *See* ECF No. 151 at Ex. 4, 00.09.00.  The government disclosed the at-issue bodycam videos
in DVD format.  *See* ECF No. 151 (notice of manual filing, explaining timestamp discrepancies).

22  The timestamps on the videos are incorrect, so I cite to the approximate timestamps of the video
clips that were produced.  Many of the videos show the same scene from multiple different

23  cameras.

     [62] *Id.* at Ex. 4, 00:06:30.

The footage shows that Metro officers spotted the car in Guerrero's apartment complex and parked behind it for several hours, assuming that it was empty.[63]  The officers left at one point to refuel, but when they returned, the car had moved.[64]  After a thorough search of the complex and areas nearby, the car was rediscovered in a different part of the same parking lot.[65]  Eventually the officers realized that Guerrero was in the car—and had been all morning[66]—and they descended upon the car, drew their weapons, and loudly instructed Guerrero to exit the car.[67]  Guerrero complied and was placed under arrest.[68]  Eventually, it appears, nearly every law-enforcement officer in town and an entire fleet of police vehicles found their way to Guerrero's apartment complex's parking lot.  The search of Guerrero's car revealed paraphernalia associated with drug use and 9 mm ammunition.[69]

While detained, Guerrero had many conversations with officers.  In some, he tried to explain his behavior, noting that he had "passed out" in the car when it was parked in the first location, woke up, saw the cops, and "also the sun was f***ing beating in [his] f***ing face, so [he] moved" his car.[70]  He at one point mentioned that someone in a red car parked near him was acting suspicious.[71]  He admitted to using heroin and, throughout the several hours he was under

---

[63] *See id.* at Exs. 1–3.

[64] *Id.* at Ex. 4.

[65] *Id.* at Ex. 5, 00:10:45.

[66] The officers who were initially watching the car observed that Guerrero must have been in the car for several hours before it was moved, noting that it was the only way to explain "how he moved so quickly." *Id.* at Ex. 11, 00:01:30.

[67] *Id.* at Exs. 5–7.

[68] *Id.*

[69] *See id.* at Exs. 5 and 14.

[70] *Id.* at Ex. 13, 00:00:30–00:01:18.

[71] *Id.* at Ex. 13.

arrest, he appeared to experience negative effects of that drug use, repeatedly moaning, swearing, retching, and asking for water.[72]  One of the officers watching Guerrero described him as "dope sick."[73]  In other footage, Guerrero talks with officers about his school activities and other niceties.[74]  It's also implied from his interactions with some detectives that Guerrero gave consent for officers to look through his phone to learn information about Bates.[75]

Eventually it becomes reasonably clear from the footage that Guerrero falls off the list of suspects that the officers are most interested in, and they shift their focus to Bates.  Guerrero is then repeatedly allowed to exit the police cruiser, have his handcuffs removed, and sit in a shady spot in the parking lot.[76]  The officers leave him sitting on the curb several times without supervision.[77]  He is transitioned from tight handcuffs to looser ones throughout the day.[78]  And it appears that Guerrero was cooperating with officers and SWAT teams that were preparing to enter his and Bates's apartment to search for Bates.[79]

**B.    The bodycam footage is exculpatory.**

At the hearing on the second motion for a new trial, both parties provided their assessments of what these videos show.  The government argued that nothing about Guerrero's

---

[72] *See e.g., id.* at Ex. 15.

[73] *Id.*

[74] *Id.* at Exs. 14, 21.

[75] *Id.* at Ex. 15, 00:20:00.  In an exchange with Guerrero, an officer asks something like, "do you still consent to me going through your phone" and inquires whether Guerrero had text or other conversations with Bates on that phone.  Guerrero's answer is inaudible, but it's implied that Guerrero reiterates consent to a search of his phone.

[76] *See e.g., id.* at Exs. 19–28.

[77] *Id.* at Exs. 20–23.

[78] *Id.* at Exs. 22, 25.

[79] *Id.* at Ex. 24.

movements or personality that day would be exculpatory to Bates, suggesting that there was a

reasonable explanation for Guerrero's actions that have nothing to do with him being the shooter.

Defense counsel responded that the footage shows that Guerrero matched the eyewitness's

descriptions of the shooter, the police were looking for him (and not just the car he was in)

because he matched that description, and his actions were unreasonably suspicious and not

sufficiently explained in the numerous hours of his parking-lot detention.

After reviewing the footage in its totality, I find that Bates's characterization is the more

plausible one.  The videos depict Guerrero as he appeared and behaved the day of the shooting

and confirm that his physical description matched eyewitness descriptions of the shooter.  The

officers believed that was the case as well, as they were told to look for Guerrero and his car and

were given pictures of him to assist his apprehension.  The officers' treatment of Guerrero as the

primary suspect immediately following the shooting would have bolstered Bates's argument that

Guerrero was the true culprit.[80]

As anyone who has spent a day in the heat of a Las Vegas August understands,

Guerrero's act of hiding inside his parked, non-running car for at least three hours is also

objectively bizarre behavior.  Indeed, the officers and Guerrero himself complained throughout

---

[80] At trial and at the hearing on this topic, officers and the prosecution corrected the defense by saying that Guerrero was always merely a "person of interest."  *See, e.g.*, ECF No. 87 at 65 (Question: "Okay.  And now, based on the descriptions you were given, the videos you watch, the license plate, Jesus Guerrero became your prime suspect; correct?  Answer: He became a person of interest.").  The officers at the scene that day refer to Guerrero repeatedly as a suspect and are told to look for Guerrero, not the car, so any implication that Guerrero was not considered a suspect immediately following the shooting is disingenuous at best.  But even if I were to buy this semantic argument, it would not change my analysis.  The now-disclosed videos speak for themselves and show that the officers in several squad cars were interested in finding Guerrero—and only Guerrero—after the shooting, regardless of the ad hoc label he's now been given.

the day about the heat.[81]   The footage showing that he was under the influence of heroin and

disoriented from his drug use suggests a further reason to investigate his actions more closely.

That he moved his car after being surveilled by officers for at least two hours also tends to

suggest consciousness of guilt.  And that he was in the car used for the shooting only amplifies

the connections between the shooting, Guerrero, and his strange behavior.

The remaining videos depicting Guerrero's arrest and subsequent treatment by police do

not mitigate the exculpatory nature of this footage.[82]   That Guerrero was chatty with officers

does not demonstrate only that he had nothing to hide, but also perhaps that he was spinning a

story to redirect their suspicion.  And that officers relaxed their protocols with Guerrero after

hours of his detention does not necessarily make this footage any less exculpatory—it may

merely show that Guerrero had successfully shifted the blame to Bates, which was Bates's

primary defense at trial.  All in all, the footage not only corroborated, but was strong evidence of,

the existence of an alternative suspect, and it would have supported the theory that Guerrero

committed the shooting and falsely shifted the blame to Bates.  So I find that the footage was

exculpatory and thus the government was obligated under *Brady* to turn it over.

**II.      The government suppressed this exculpatory bodycam evidence.**

The second *Brady* inquiry is whether the exculpatory evidence was suppressed by the

government.  Courts resolve this question "irrespective of the good faith or the bad faith of the

prosecution."[83]   The defendant "bears the initial burden of producing some evidence to support

---

[81] *See, e.g.*, *id.* at Ex. 14, 00:03:30 (an officer exclaiming "god damn it's hot"); Ex. 15, 00:09:30 (Guerrero exclaiming that it was very hot in the back of the squad car and that he was "sweating bullets").

[82] *See, e.g.*, *id.* at Exs. 19–23.

[83] *United States v. Price*, 566 F.3d 900, 907–908 (9th Cir. 2009) (quoting *Brady*, 373 U.S. at 87).

an inference that the government possessed or knew about material favorable to the defense and failed to disclose it."[84]  The burden then "shifts to the government to demonstrate that the prosecutor satisfied his duty to disclose all favorable evidence known to him or that he could have learned from 'others acting on the government's behalf.'"[85]

The parties dispute whether the bodycam evidence was suppressed.  Bates argues that his counsel asked for the footage but was told that none existed.[86]  The government contests that representation and responds that "the existence of body-worn[-]camera recordings of uniformed [Metro] officers' response to the August 18, 2020, shooting was known to [Bates] during the pendency of trial."[87]  It also attempts to blame the failure to turn over this evidence on Bates's decision to invoke his constitutional right to a speedy trial.

### A.      Counsel's competing representations

Bates attached to his second motion for a new trial a declaration from his trial counsel, Jawara Griffin, Esq., that "a request was made to [assistant United States attorney] Ihler requesting body[-]worn[-]camera footage of the initial questioning of [] Guerrero as he sat in his car outside of the apartment complex on August 18, 2020," but Ms. Ihler told Mr. Griffin there was no footage of that interaction.[88]

At the motion hearing on this issue, Mr. Duncan (one of the prosecutors at trial) represented that he watched some of the at-issue footage before trial, but he determined that it

---

[84] *Id.* at 910 (cleaned up).

[85] *Id.* (quoting *Kyles*, 514 U.S. at 437).

[86] ECF No. 141.

[87] ECF No. 147 at 8.

[88] ECF No. 141-2 at 2.

had no relevance to Bates's case.[89]  He stated that he later "contacted Mr. Griffin and []

explained to him . . . that we would probably need some sort of memory device . . . to transfer"

the large file of videos.[90]  Mr. Duncan recalled asking Mr. Griffin if he wanted the videos and

that Mr. Griffin responded "in the negative."[91]  There's no confirming email memorializing such

a discussion.  Ms. Ihler (the other trial prosecutor) also spoke at the hearing and did not recall

any conversation with Mr. Griffin about this bodycam footage.[92]  She found emails between

herself and her legal assistant in which the assistant stated that they were not turning over the

footage "per a conversation with Mr. Duncan."[93]  The assistant U.S. Attorney arguing the

motion, Dan Cowhig, Esq., explained that a comprehensive review of the footage would have

taken weeks of full-time viewing, and so it made "sense in the pendency of a trial in which

speedy trial has been invoked that counsel [were] not going to watch through every single

video."[94]

---

[89] ECF No. 152 (motion hearing).

[90] *Id.*

[91] *Id.*

[92] *Id.*

[93] *Id.*

[94] *Id.*  At the hearing on the new-trial motion, the government also misstated numerous facts of this case.  For example, counsel stated that Bates's DNA was found on the firearm.  It wasn't—the government's DNA analyst testified that all DNA testing was inconclusive.  The government also represented that the prosecutors at trial may not have offered evidence of syringes found in Bates's backpack at trial because "the charges were not related to possessing or trafficking in a controlled substance but [instead] to possession of a firearm" and thus that evidence of personal drug use may have been prejudicial.  But possession of a firearm in furtherance of drug trafficking was one of the charges Bates was convicted of, and one of his primary defenses was that the drugs found on his person were for personal use.  Although these misrepresentations don't factually impact my ruling, they do lessen the government's credibility in this they-said–they-said contest.

Mr. Griffin also spoke at the hearing and represented "without any equivocation" that he "specifically asked for any video of the surveillance of [] Guerrero in the parking lot" and was told that there was no video of that surveillance.[95]  He adamantly stated that no conversation of the type that Mr. Duncan described had occurred and that he would have never turned down evidence had it been offered.

### B.   The prosecution knew about the bodycam footage and failed to disclose it.

Regardless of whose account I credit, what is undisputed is that the prosecution did not thoroughly review the footage at issue to truly assess whether it contained exculpatory material and thus never described it to the defense as such.[96]  That failure led to a *Brady* violation here. As the Ninth Circuit has explained, "[t]he prosecutor's actual awareness (or lack thereof) of exculpatory evidence in the government's hands . . . is not determinative of the prosecution's disclosure obligations.  Rather, the prosecution has a duty to learn of any exculpatory evidence known to others acting on the government's behalf.  Because the prosecution is in a unique position to obtain information known to other agents of the government, it may not be excused from disclosing what it does not know but could have learned."[97]

The government argued at the hearing that it gave Bates enough information about this evidence to satisfy *Brady*.  It noted that defense counsel received a transcript of an audio interview with Guerrero that occurred during his August 18th arrest, and thus would have been aware "that there was significant police investigation of this and that there would have been

---

[95] *Id.*

[96] *See Amado v. Gonzalez*, 758 F.3d 1119, 1135 (9th Cir. 2014) ("The prosecutor's obligation under *Brady* is not excused by a defense counsel's failure to exercise diligence with respect to suppressed evidence.").

[97] *Carriger v. Stewart*, 132 F.3d 463, 479–80 (9th Cir. 1997) (en banc) (internal citations omitted).

other evidence available."[98]  But knowledge of the fact that Guerrero was interviewed off camera is not the same as knowledge of the contents of hours upon hours of bodycam footage before and after that interview.[99]  Regardless, I credit defense counsel's representation that they suspected body-worn cameras were used during Guerrero's arrest, asked the government to produce footage from them, and was told no such footage existed.  And a prosecutor's statement that certain evidence does not exist cannot be overcome by circumstantial suggestions that it actually does, for the Supreme Court's "decisions lend no support to the notion that defendants must scavenge for hints of undisclosed *Brady* material when the prosecution represents that all such material has been disclosed."[100]

　　　　At the hearing on this motion, government counsel suggested that trial counsel's decision not to watch all of the footage related to this case should be excused because Bates had invoked his constitutional speedy-trial right, explaining that "it makes sense in the pendency of a trial in which speedy trial has been invoked that counsel are not going to watch through every single video because" there was so much of it—82 hours, 32 minutes, and 45 seconds, in fact.[101]  He estimated that the process of reviewing those videos would "take[] at least three times the duration of the video," or "about a month and a half" if someone reviewed these videos full time.[102]  The government's hearing counsel emphasized that, although he had watched the videos

---

[98] ECF No. 152.

[99] *See Tennison v. City & Cnty. of San Francisco*, 570 F.3d 1078, 1091 (9th Cir. 2000) (noting that the defendant's knowledge that a witness had information about the murder at issue "is not the same as [knowledge of the witness's] extensive statements to the police" and determining that the prosecution suppressed that information).

[100] *See Banks v. Dretke*, 540 U.S. 668, 696 (2004).

[101] ECF No. 152 (motion hearing).

[102] *Id.*

20

1  in preparation for the new-trial motion hearing, he "was able to" do so "at more leisure than the

2  trial team because [he] wasn't under the gun for a speedy trial."[103]

3      The government's attempt to blame its *Brady* violation on Bates's decision to invoke his

4  constitutional speedy-trial right is not well taken.  That Bates put the prosecution to its burden

5  promptly does not relieve the government of its "duty to learn of any favorable evidence known

6  to the others acting on the government's behalf."[104]  Also implausible is the government's

7  excuse that it couldn't turn over the footage without getting help from the defense because it was

8  a large digital file and they may not have had the tools to easily transfer it.  In this twenty-first

9  century, when cloud storage and multi-terabyte hard drives are readily available, a large digital-

10  file size is no justification for the government to shirk its *Brady* obligations.  And the suggestion

11  that the U.S. Attorney's Office, with the resources of the Department of Justice behind it,

12  couldn't marshal enough personnel to view 82 hours of video before trial is just too preposterous

13  to address.

14      The prosecutors had this bodycam video well before trial but chose not to look at it in a

15  sufficiently meaningful way to determine whether it contained *Brady* material.  While it was

16  entirely feasible to provide it to defense counsel before trial, thus eliminating the risk that this

17  unwatched footage was improperly suppressed,[105] the government instead waited more than a

18  year after trial—until the eve of the hearing on defendant's second motion for a new trial—to

19

20  [103] *Id.*

   [104] *Kyles*, 514 U.S. at 437.

21  [105] *United States v. Agurs*, 427 U.S. 97, 108 (1976) (noting that "the prudent prosecutor will
   resolve doubtful questions in favor of disclosure"); *Kyles*, 514 U.S. at 1995 (confirming that
22  prosecutors should err on the side of disclosure, reasoning that "[s]uch disclosure will serve to
   justify trust in the prosecutor as 'the representative of a sovereignty whose interest in a criminal
23  prosecution is not that it shall win a case, but that justice shall be done" (quoting *Berger v.
   United States*, 295 U.S. 78, 88 (1935) (cleaned up)).

1 turn it over.[106]  I find that this footage was, in fact, suppressed, satisfying the second *Brady*

2 prong.

3 **III.     The undisclosed evidence erodes the court's confidence in the outcome of this trial.**

4        The third and final prong of the *Brady* analysis asks whether the suppressed, exculpatory

5 evidence was material.  "The touchstone of materiality review is whether admission of the

6 suppressed evidence would have created a 'reasonable probability of a different result.'"[107]  To

7 meet that burden, the defendant must show only that "the government's evidentiary suppression

8 'undermines confidence in the outcome of the trial.'"[108]  He need not show that he "would more

9 likely than not have received a different verdict with the evidence."[109]  "In considering whether

10 the failure to disclose exculpatory evidence undermines confidence in the outcome, judges must

11 'undertake a careful, balanced evaluation of the nature and strength of both the evidence the

12 defense was prevented from presenting and the evidence each side presented at trial.'"[110]  The

13 suppressed evidence must be "considered collectively, not item by item."[111]

14        This case bears similarity to *Kyles v. Whitley*, in which the Supreme Court of the United

15 States found that undisclosed evidence about an alternate-suspect-accuser violated *Brady* and

16 necessitated a new trial.  In *Kyles*, a woman was shot and killed leaving a grocery store, and her

17

18

---

19 [106] Well, most of it.  Government counsel acknowledged at the hearing on the second new-trial

20 motion that there remained some bodycam footage that—astonishingly—still hadn't been turned over, along with some yet-undisclosed Jencks Act material.

21 [107] *Jernigan*, 492 F.3d at 1053 (quoting *Kyles*, 514 U.S. at 434) (cleaned up).

[108] *Id.* at 1054 (quoting *United States v. Bagley*, 473 U.S. 667, 678 (1985)).

22 [109] *Id.*

23 [110] *Id.* (quoting *Bailey v. Rae*, 339 F.3d 1107, 1109 (9th Cir. 2003)) (cleaned up).

[111] *Kyles*, 514 U.S. at 436.

car was taken by the gunman.[112]  The police received a call from a man later identified as "Beanie," who said he bought a car that day that he believed to be the victim's.[113]  Beanie met with the police several times, told officers several versions of a story that identified Curtis Kyles as the man who committed the crime, and led the police to find key evidence at Kyles's home.[114] Those stories were inconsistent, and several details could have inculpated Beanie rather than Kyles.[115]  But the officers investigated only Kyles, and the prosecution later charged Kyles with the murder.[116]  The prosecution did not turn over various pieces of evidence related to Beanie's statements.[117]  At trial, the defense theorized that Beanie had framed Kyles and planted evidence at Kyles's apartment "for the purposes of shifting suspicion away from himself."[118]

The High Court held that Beanie's statements (viewed cumulatively with other withheld evidence) eroded the Court's confidence in the trial's outcome.[119]  The Court noted that, had the defense been able to call Beanie as a witness, "he could not have said anything of any significance without being trapped in his inconsistencies," calling into question the reliance the police placed on Beanie's version of events.[120]  Regardless, the defense could have "attacked the

---

[112] *Id.* at 423.

[113] *Id.* at 424–25.

[114] *Id.* at 425–28.

[115] *Id.*

[116] *Id.* at 428.

[117] *Id.* at 428–29.

[118] *Id.*

[119] *Id.* at 442–49.

[120] *Id.* at 445.

reliability of the investigation in failing to even consider Beanie's possible guilt and in tolerating (if not countenancing) serious possibilities that incriminating evidence had been planted."[121]

While the cumulative weight of the evidence suppressed in *Kyles* was stronger than that here, the parallels are nonetheless significant.  In both cases, evidence related to an alternate suspect who used his time with the police to shift suspicions onto another person was suppressed.  Guerrero's conduct and statements on August 18th were suspicious enough to warrant a second look at any possible role he played in the shooting and to require that Bates's counsel knew the full extent of those actions.  Had defense counsel been given these videos, they may have also been able to call into question the caliber and the reliability of the investigation that refocused on Bates only after conversations with Guerrero.[122]

The evidence presented at trial to suggest Bates's guilt was not so strong as to outweigh the effect that the bodycam footage may have had on a jury.  The government's case against Bates was largely circumstantial.  The evidence tying Bates to the shooting was mainly the discovery of the gun used in the shooting in Bates's backpack and black clothes matching the shooter's description in the car Bates was riding in when he was arrested at the Family Dollar store.  But there was no direct evidence that Bates was the shooter, and the only eyewitness to testify was certain that Bates was not him.  She described the shooter as having darker skin and appearing Hispanic, not white—a description that better matched Guerrero.  So evidence showing Guerrero's appearance on the day of the shooting would have allowed the jury to better assess the credibility of the eyewitness's testimony and determine whether Bates or Guerrero better matched her description and the surveillance evidence of the shooter.

---

[121] *Id.* at 446.

[122] *See id.*

1    Other weaknesses in the government's case could have been exposed by direct evidence

2  of Guerrero's behavior as depicted in these videos.  The government's DNA analyst testified that

3  the weapon found in Bates's backpack contained the DNA of at least five different people,

4  leaving open the possibility that Guerrero handled the gun.  And surveillance footage from the

5  apartment complex showed a man wearing clothes matching the description of the shooter

6  entering the apartment's lobby soon after the shooting, but shows only Guerrero leaving the

7  complex a few minutes later.  An officer testified that the camera would have picked up anyone

8  who came and went from Guerrero's and Bates's apartment, but Bates was never seen leaving,

9  and he was not in the apartment when the officers searched it.  So the suppressed footage would

10  have supported the theory that Guerrero entered his apartment, quickly changed his clothes to

11  evade suspicion, and left shortly after.  It would also have allowed the jury to compare the shoes

12  Guerrero was wearing when he was arrested with those of the shooter.  In sum, this undisclosed

13  footage is consistent with defense counsel's theory that it was Guerrero, and not Bates, who

14  committed the shooting.

15    Justice requires that Bates be retried with the benefit of this *Brady* material, so I grant the

16  motion raising this contention.  I recognize that Bates was found guilty of four different crimes,

17  only one of which was solely related to the August 18th shooting.  The others were connected to

18  Bates's arrest three days later.  But the government's presentation of this case weaved both

19  events together in a manner that makes it impossible for the court to determine whether the jury's

20  determination of guilt on the other counts can be separated from the shooting-related charge.  So

21  I order a new trial on all counts.

22

23

**Conclusion**

FRCP 33 allows the court to "vacate any judgment and grant a new trial if the interest of justice so requires."[123]  The briefing and hearings related to these motions for a new trial have revealed a spate of discovery violations, including the failure to turn over search warrants and tracking data showing how Metro officers found Bates, despite being specifically asked for that information; and the government's admission that it still hasn't turned over all of the bodycam footage, some of which contains eyewitness statements that would qualify as Jencks Act material.  The government's suggestion that Bates's invocation of his speedy-trial right is to blame for these oversights is disconcerting.  While neither side displayed its best work when litigating this case, the bulk of the blame for these discovery deficiencies rests on the government's failure or perceived inability to turn over evidence that Bates was entitled to.

**IT IS THEREFORE ORDERED** that defendant James Bates's second motion for a new trial **[ECF No. 141] is GRANTED**, and Bates's first motion for a new trial **[ECF No. 92] is DENIED as moot**.[124]

**IT IS FURTHER ORDERED** that **this case is placed on the August 8, 2023, trial stack for retrial**, and a new trial order will issue separately.

Finally, the government is **ORDERED** to turn over to Bates's counsel **all** body-worn-camera footage related to Bates or Guerrero from August 2020 immediately.

_____
U.S. District Judge Jennifer A. Dorsey
June 15, 2023

---

[123] Fed. R. Crim. P. 33(a).

[124] Because I grant a new trial based on the government's failure to turn over the bodycam footage, I need not and do not reach Bates's remaining arguments.  I also deny without prejudice Bates's request that I compel the prosecution to disclose disciplinary files for the officers involved in the search of Bates's car (ECF No. 141 at 9) because such information is irrelevant to the issues decided here and should have been brought as a separate discovery motion.

26